IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KRISTA L. NOMES, )
        Plaintiff, )
v. ) Civil Action No. 09-112 Erie
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
        Defendant. )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District Judge.

Plaintiff Krista L. Nomes ("Nomes") commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("Act") [42 U.S.C. §§ 401-433, 1381-1383f].

### I. PROCEDURAL HISTORY

Nomes protectively applied for DIB and SSI benefits on April 12, 2006, alleging disability as of November 5, 2005 (AR 45; 51; 180). The applications were administratively denied on July 19, 2006 (AR 41; 186). Nomes requested an administrative hearing and on October 24, 2007, a hearing was held in Erie, Pennsylvania, before an Administrative Law Judge (the "ALJ") (AR 40; 191). Nomes, who was represented by counsel, appeared and testified at the hearing, as did an impartial vocational expert (AR 194-226). In a decision dated November 27, 2007, the ALJ determined that Nomes was not "disabled" within the meaning of the Act (AR 10-20). The Appeals Council denied Nomes' request for review on March 20, 2009, thereby rendering the ALJ's decision the final decision of the Commissioner in this case (AR 4). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgement. For the reasons that follow, the Commissioner's motion will be denied and Nomes' motion will be granted only to the extent she seeks a remand for further consideration.

## II. Background

Nomes has a history of using drugs such as heroin, crack and cocaine (AR 204).[1] After being imprisoned in January 2006, she was sent to the Deerfield Dual Diagnosis Center for inpatient rehabilitation (AR 90, 204). Treatment notes dated February 16, 2006 through March 12, 2006 reflect that she reportedly last abused drugs in January 2006 (AR 91). Progress notes show that she tolerated treatment "well" and by March 3, 2006 her mood was reported as "good" with no suicidal or homicidal thoughts (AR 88-89).

Following her release from inpatient rehabilitation, Nomes lived at a halfway house and sought mental health treatment at the Stairways Behavioral Health Outpatient Clinic ("Stairways") (AR 81-83). On May 9, 2006, Robin Bailey, M.D. performed a psychiatric examination and evaluation (AR 83-89). Nomes relayed a long history of psychiatric hospitalizations, the first of which occurred when she was only thirteen years old (AR 84). She reported "lifetime symptoms" of suicidal thoughts, events and repetitive self-injury dating back to age fourteen (AR 83). She had also tried to commit suicide by means of a drug overdose at one point (AR 84). At the time of the evaluation, she stated that her mood was stable and she was doing "pretty well" with only mild symptoms of suspiciousness (AR 83). She was on Celexa, Depakote and Risperdal with minimal side effects (AR 84). She denied any recent suicidal thoughts, but had some self-injurious thoughts in March 2006 (AR 84). She reported that her symptoms of paranoia were improving, but she still had some auditory hallucinations which sounded like her own voice (AR 84). Dr. Bailey did not believe these were "true" auditory hallucinations in the "psychotic sense" (AR 84).

Dr. Bailey noted that Nomes had experienced mood swings and full-blown manias and depressions, including during the time she was not taking drugs (AR 83). She further noted that Nomes had vague paranoia and atypical auditory hallucinations, also while abstinent from drugs and alcohol (AR 83). On mental status examination, Dr. Bailey observed that Nomes was neatly groomed, wearing appropriate makeup and fashionable clothing (AR 86). She was cooperative during the evaluation and maintained good eye contact (AR 86). She exhibited an appropriate affect, except when she laughed inappropriately while discussing prior physical abuse; her

---

[1] A treatment note authored by Dr. Bailey on May 9, 2006, states that Nomes began using drugs and alcohol when she was seven or eight years old. (AR 83). The documentary record, however, contains no evidence predating February 16, 2006 (AR 2; 90-92).

2

thought pattern was logical and goal-directed; and her memory was "grossly normal" (AR 86). Dr. Bailey found her thought content was remarkable for vague suspiciousness and some atypical auditory hallucinations described as "her own voice arguing in her head" (AR 86).

Dr. Bailey noted that her primary presenting issue was due to polysubstance dependency, but that her history was "strongly suggestive of bipolar type I, in addition, due to her history of marked manic symptoms in the absence of substances" (AR 86). Although Nomes complained of some vague psychotic symptoms, Dr. Bailey found that these symptoms had largely improved with her current medication regimen (AR 86). She diagnosed her with polysubstance dependency, bipolar type I, and "rule out schizoaffective disorder" (AR 86). Dr. Bailey assigned her a Global Assessment of Functioning ("GAF") score of 47-50 (AR 87).[2]

Progress notes from Stairways dated May 23, 2006 indicate that Nomes apparently secured a night shift job while living at the halfway house (AR 164). On June 13, 2006, she had moved to the Mercy Center and was reportedly working a second shift factory job (AR 164). On mental status examination, her mood was reported as euthymic (normal), she was cooperative, and she denied suffering from any psychosis or suicidal thoughts (AR 164). Dr. Bailey reported her bipolar disorder as "stable" and continued her medications (AR 164).

Roger Glover, Ph.D., a state agency reviewing psychologist, reviewed the psychiatric medical evidence of record on July 12, 2006 and concluded that Nomes was only mildly restricted with respect to her activities of daily living, had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and had no repeated episodes of decompensation of extended duration (AR 112). Dr. Glover completed a mental residual functional capacity assessment form and opined that Nomes was not significantly limited or only moderately limited in all areas of work functioning (AR 115-116). According to Dr. Glover, Nomes remained capable of understanding and remembering instructions, concentrating, interacting appropriately with people, adapting to changing activities within the workplace, could maintain regular attendance and be punctual, and maintain socially appropriate behavior (AR 117). Dr. Glover found she could function in production oriented jobs requiring little

---

[2] The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. It represents "the clinician's judgment of the individual's overall level of functioning." *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 32 (4th ed. 2000). Scores between 41 and 50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id*.

3

independent decision-making (AR 117). He concluded that Nomes could "meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment" (AR 117).

On August 25, 2006, Nomes presented to the emergency room at Saint Vincent Health Center complaining of an increase in her depression, suicidal thoughts and "vague assaultive ideations" (AR 118). She was evidently thinking about cutting herself at the time of her admission (AR 118). She stated that her primary stressor was a recent stay at the Mercy Center as part of her recovery program, and described the environment as extremely "stressful" (AR 118). Nomes reported that she had been sober since January 2006, but still had problems with anger and poor impulse control (AR 118). She further reported that her depressive symptoms had decreased during a prior two and one-half year period of sobriety (AR 118). Treatment notes reflect however, that she reportedly "continued to experience periods lasting for up to one week during which she had increased psychomotor agitation (bouncing off walls, euphoric affect, restlessness, and increased energy)" (AR 118). Hema Iyer, M.D., admitted Nomes to the hospital for inpatient treatment (AR 119). Nomes indicated that her medications (Depakote, Celexa and Risperdal) were not working, so Dr. Iyer started her on Neurontin, Abilify and Effexor (AR 119). By August 28, 2006 Nomes was reportedly "feeling better" and participating in individual and group therapy (AR 119). On mental status examination at the time of discharge, Dr. Iyer reported that Nomes had regular speech, a "better" mood and a "near euthymic" affect (AR 120). Her thoughts were sequential and goal-directed and she denied suicidal thoughts, hallucinations and delusions (AR 120). Her psychomotor activity was within normal limits (AR 120). Dr. Iyer diagnosed Nomes with bipolar affective disorder and polysubstance abuse in early remission (AR 120). She assigned her GAF score of 60 (AR 120).[3] She was discharged from St. Vincent on August 31, 2006, with prescriptions for Neurontin, Abilify and Effexor (AR 120).

During the fall of 2006, Nomes spent ninety days in prison for violating the terms of her probation by failing to notify her probation officer that she had changed her living arrangement (AR 203). Following her release, she returned to Stairways for treatment on December 20, 2006 and stated that she wanted to resume her medications (AR 159). She complained of symptoms of

---

[3] Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id*.

4

depression and impulsiveness, i.e,. shopping and cleaning for extended periods of time (AR 159). She further complained of experiencing flashbacks (AR 159). Treatment notes indicate that Nomes was reportedly quiet and reserved (AR 159). She reported that although her mood was stable, she was depressed more than usual with no interest in activities (AR 159). She denied having any suicidal or homicidal thoughts, hallucinations or delusions, and had no feelings of paranoia or persecution (AR 159). She was restarted on Abilify and Effexor and scheduled to see Dr. Bailey (AR 159).

Nomes returned to Stairways on February 27, 2007 for follow up and reported to Dr. Bailey that "[a] lot [had ] happened" since her last appointment (AR 158). She stated that since her release from incarceration, her boyfriend had broken her nose and she was staying in a shelter (AR 158). She relayed a recent Hepatitis C diagnosis (AR 158). Dr. Bailey reported that Nomes was adequately groomed, talkative and anxious, but denied suffering from suicidal or homicidal thoughts or symptoms of psychosis (AR 158). It was noted that Nomes wanted to "get [a] job" (AR 158). She was diagnosed with a mood disorder not otherwise specified and polysubstance dependency due to a "recent relapse" (AR 158). Dr. Bailey adjusted her medications; the Effexor dosage was increased, she was restarted on Neurontin, the Abilify was discontinued, and the Geoden dosage was adjusted (AR 158).

On April 3, 2007, Jill A. Rys, a certified physician's assistant affiliated with Bayfront Digestive Disease Associates, noted that Nomes' medical history was remarkable for bipolar disorder with drug induced schizophrenia and previous suicide attempts, as well as hospitalizations for psychiatric illness (AR 140). It was noted that Nomes had been in recovery from substance abuse for approximately three months (AR 140). Ms. Rys opined that Nomes was a potential candidate for hepatitis C therapy, but she "preferred" that Nomes be further along in her drug recovery program prior to proceeding with treatment (AR 140-141; 143). She recommended laboratory studies and a liver biopsy for staging purposes (AR 140). Nomes subsequently underwent a liver biopsy on May 7, 2007 (AR 139).[4]

Stairways treatment notes indicate that Nomes' Neurontin dosage was increased on April 9, 2007 after she complained that the Geoden was not working (AR 156). On April 26, 2007,

---

[4] The results of the liver biopsy are not contained in the record. Nomes testified at the hearing that she had never received the results (AR 209-210).

Nomes complained to Dr. Bailey that she was suffering from nightmares and "paranoia" (AR 154). She was living in transitional housing, and stated she felt fine on some days and on other days she did not (AR 154). She indicated she was "fighting" depression and had fleeting thoughts of cutting herself (AR 154). Dr. Bailey noted that Nomes had been engaged in volunteering activities (AR 154). Dr. Bailey reported that she was talkative and anxious, but she denied suicidal/homicidal thoughts (AR 154). She diagnosed her with a mood disorder not otherwise specified, post traumatic stress disorder and substance abuse (AR 154). Her Geoden dosage was increased due to her symptoms of anxiety, paranoia and post traumatic stress nightmares, and she was continued on Neurontin and Effexor (AR 154).

Nomes returned to Stairways on June 4, 2007 and Dr. Bailey's treatment notes state that Nomes was "5 months clean" (AR 153). Nomes reported that she could stay in transitional housing for up to one year (AR 153). She was reportedly distressed over her health issues and issues related to her ex-husband (AR 153). Dr. Bailey reported on mental status examination that Nomes was neatly groomed with "dramatic makeup" (AR 153). She had increased "suspiciousness" and she complained of flashbacks from prior drug use (AR 153). Dr. Bailey reported she was tense and euthymic (AR 153). She was diagnosed with a mood disorder not otherwise specified and polysubstance dependency (AR 153). Dr. Bailey continued her on Effexor and increased her Neurontin and Geoden dosages (AR 153).

Nomes was voluntarily admitted to Millcreek Community Hospital ("Millcreek") in Erie on August 7, 2007 (AR 172-176). She indicated that she had not used any illegal drugs or alcohol since January 2007 (AR 175). Nomes reported experiencing auditory and visual hallucinations, and "vaguely" claimed she had problems with hallucinations (AR 175). She further complained of depression, mood instability and paranoia for a "long time" (AR 175). She reported the occurrence of "disturbing visions" in which she could see herself "cutting herself and committing suicide" (AR 175). Her medications upon admission were Effexor, Neurontin and Geoden (AR 172). Mental status examination upon admission revealed that Nomes was "generally uncooperative," she refused to answer most questions, she appeared paranoid and suspicious and her judgment and insight were significantly impaired (AR 176). Dr. Sean Su, her

6

treating psychiatrist, assigned her a GAF score of 35-40 upon admission (AR 176).[5] During her hospitalization, he discontinued the Geoden since Nomes claimed it was "not helpful" and added Invega for her psychotic symptoms (AR 172-173). Nomes also participated in individual and group therapy, and was subsequently discharged from Millcreek on August 9, 2007, after showing "significant clinical improvement" (AR 173). Dr. Su diagnosed Nomes with psychotic disorder not otherwise specified, "rule out schizophrenia paranoid type," "[r]ule out psychosis secondary to substance abuse," and a history of polysubstance dependence (AR 176). He assigned her a GAF score of 55 upon discharge (AR 173-174).

      Nomes testified at the administrative hearing that she resided in "transitional housing" and had been there for approximately eight months (AR 195). Prior to that, she lived in a shelter for victims of domestic violence for three months (AR 196). She indicated that she had been "clean" since 2006 except for a brief relapse in December 2006 (AR 204-205). She last had audio hallucinations in August 2007 prior to her admission at Millcreek (AR 211). Nomes testified that she was able to perform household chores, attended AA and NA meetings, and saw her family once per week (AR 213-214). She claimed she had suffered from psychiatric problems since she was a child and had been on medication since she was fourteen years old (AR 216). At the time of the hearing she took Neurontin for mood stablization, Effexor for depression and Invega for schizophrenia (AR 200). Nomes indicated that she performed some volunteer work through the Mental Health Association when she felt "good" (AR 207; 218). She stated she had bad days "[a] couple of times a week" where she stayed home and isolated herself, and she continued to suffer from nightmares and flashbacks (AR 219-222).

      The ALJ asked Sam Edelman, the vocational expert, to consider an individual with the same age, education and background as Nomes, who could perform simple work that did not require direct interaction with the public, intensive supervision, changes in the work setting, decision making, or a "competitive production rate pace" (AR 223-224). The vocational expert testified that such an individual could perform work as an office cleaner, hotel/motel cleaner or stock clerk (AR 224).

---

[5] Scores between 31 and 40 indicate "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; ...)." *Id.*

7

### III. STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3rd Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3rd Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3rd Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3rd Cir. 2004).

In an action in which review of an administrative agency's determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3rd Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

## IV. Discussion

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3rd Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3rd Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3rd Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3rd Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3rd Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth

9

> stage, the fifth, and final, step requires the SSA to consider so-
> called "vocational factors" (the claimant's age, education, and past
> work experience), and to determine whether the claimant is capable
> of performing other jobs existing in significant numbers in the
> national economy. §§ 404.1520(f), 404.1560(c), 416.920(f),
> 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003) (footnotes omitted).

Section 105 of the Contract With America Advancement Act of 1996 ("CWAAA") amended Titles II and XVI to provide that "an individual shall not be considered to be disabled" under the Social Security Act if "alcoholism or drug addiction" would be "a contributing factor material to the Commissioner's determination that the individual is disabled." Pub. L. No. 104-121, § 105; 110 Stat. 847, 852-853 (1996); 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J). The Commissioner has promulgated regulations to implement the statutory mandate of the CWAAA. 20 C.F.R. §§ 404.1535, 416.935. Under the applicable regulations, the critical question is whether a claimant who is disabled as a result of drug or alcohol use would remain disabled if he or she were to stop using those substances. 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1). If his or her disability would persist even after a cessation of drug or alcohol abuse, he or she is entitled to an award of benefits. 20 C.F.R. §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii). Conversely, if a claimant's disability would not remain in the absence of drug or alcohol abuse, a finding of "materiality" is warranted, thereby requiring a denial of benefits. 20 C.F.R. §§ 404.1535(b)(2)(I), 416.935(b)(2)(I).

In summary, the Commissioner's disability determination must proceed in four discrete stages:

> First, [the Commissioner] must consider all of the claimant's
> limitations and then use the usual five-step sequential analysis to
> decide whether the claimant is disabled. Second, the
> Commissioner must determine whether there is medical evidence
> of an Alcohol Use Disorder, as defined in the *DSM*. When such
> medical evidence exists, the Commissioner must identify which of
> the claimant's limitations would remain if he stopped using
> alcohol. Finally, the Commissioner must return to the five-step
> analysis to evaluate whether the claimant's remaining limitations
> would be disabling.

*Warren v. Barnhart*, 2005 WL 1491012 at *10 (E.D.Pa. 2005).

Here, the ALJ determined that Nomes had not engaged in substantial gainful activity subsequent to her alleged onset date (AR 15). Nomes was found to be suffering from bipolar

affective disorder, post-traumatic stress disorder, substance addiction disorder, substance-induced psychosis, and hepatitis C (AR 15-16). Her bipolar affective disorder, post-traumatic stress disorder, substance addiction disorder and substance-induced psychosis were deemed to be "severe" within the meaning of 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii), while her hepatitis C was deemed to be "non-severe" (AR 15-16). At the third step of the sequential evaluation process, the ALJ concluded that, when Nomes was actively abusing drugs, a finding of *per se* disability was warranted under Listings 12.04[6] and 12.09 of the

---

[6]"12.04 *Affective Disorders:* Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
  The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
  A. Medically documented persistence, either continuous or intermittent, of one of the following:
  1. Depressive syndrome characterized by at least four of the following:
  a. Anhedonia or pervasive loss of interest in almost all activities; or
  b. Appetite disturbance with change in weight; or
  c. Sleep disturbance; or
  d. Psychomotor agitation or retardation; or
  e. Decreased energy; or
  f. Feelings of guilt or worthlessness; or
  g. Difficulty concentrating or thinking; or
  h. Thoughts of suicide; or
  i. Hallucinations, delusions, or paranoid thinking; or
  2. Manic syndrome characterized by at least three of the following:
  a. Hyperactivity; or
  b. Pressure of speech; or
  c. Flight of ideas; or
  d. Inflated self-esteem; or
  e. Decreased need for sleep; or
  f. Easy distractability; or
  g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
  h. Hallucinations, delusions or paranoid thinking; or
  3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
AND
  B. Resulting in at least two of the following:
  1. Marked restriction of activities of daily living; or
  2. Marked difficulties in maintaining social functioning; or
  3. Marked difficulties in maintaining concentration, persistence, or pace; or
  4. Repeated episodes of decompensation, each of extended duration;
OR
  C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
  1. Repeated episodes of decompensation, each of extended duration; or

11

Listing of Impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1 (AR 16).

Although the ALJ concluded that Nomes' impairments would remain "severe" if she were to stop using drugs, he determined that her impairments would not meet the Listings 12.04 and 12.09 (AR 16-17). In accordance with 20 C.F.R. §§ 404.1545 and 416.945, the ALJ assessed Nomes' residual functional capacity as follows:

> If the claimant stopped the substance abuse, the claimant would have the residual functional capacity to understand, remember, and carry out only simple instructions. She could not interact directly with the public or tolerate intensive supervision. She could not tolerate significant changes in the work setting and should not be called upon to make decisions or to perform at a competitive rate pace (such as in an assembly line) (AR 17).

Given the applicable residual functional capacity and vocational assessments, the ALJ determined that, in the absence of drug abuse, Nomes would be capable of working as an office cleaner, a hotel cleaner, or a stock clerk (AR 19). The vocational expert's testimony established that these jobs existed in the national economy for purposes of 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B) (AR 224). Therefore, Nomes' drug abuse was found to be "material" to the Commissioner's finding of *per se* disability, and her applications for DIB and SSI benefits were denied on the basis of the CWAAA (AR 20).

Nomes contends that the ALJ's conclusion that her drug usage was material to a finding of her disability is not supported by substantial evidence. The CWAAA provides that "an individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J). The Commissioner has promulgated regulations implementing this statutory mandate. Those regulations provide:

> **§ 404.1535 How we will determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.**
>
> (a) *General*. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a

---

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."
20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.04.

12

> contributing factor material to the determination of disability.
> (b) *Process we will follow when we have medical evidence of your drug addiction or alcoholism.* (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
> (i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.
> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. § 404.1535.[7] Given the language of the regulations, an initial finding of disability is a condition precedent to an inquiry into whether a finding of materiality is warranted. *Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2003); *Bustamante v. Massanari*, 262 F.3d 949, 954-955 (9th Cir. 2001).

In this case, the ALJ initially found Nomes to be *per se* disabled under Listings 12.04 and 12.09[8] (AR 16). The Listing of Impairments describes impairments which preclude an adult

---

[7] The regulations directly quoted by the Court are the ones governing materiality determinations with respect to claims for DIB benefits under Title II. 20 C.F.R. § 404.1535. Except for language indicating that a claimant may be eligible for SSI benefits because of his or her "age or blindness," the regulations governing materiality determinations under Title XVI are the same as those governing materiality determinations under Title II. 20 C.F.R. § 416.935.

[8] "12.09 *Substance Addiction Disorders:* Behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system.
   The required level of severity for these disorders is met when the requirements in any of the following (A through I) are satisfied.
   A. Organic mental disorders. Evaluate under 12.02.
   B. Depressive syndrome. Evaluate under 12.04.
   C. Anxiety disorders. Evaluate under 12.06.
   D. Personality disorders. Evaluate under 12.08.
   E. Peripheral neuropathies. Evaluate under 11.14.
   F. Liver damage. Evaluate under 5.05.
   G. Gastritis. Evaluate under 5.00.
   H. Pancreatitis. Evaluate under 5.08.
   I. Seizures. Evaluate under 11.02 or 11.03."

from engaging in substantial gainful activity without regard to his or her age, education or work experience. *Knepp v. Apfel*, 204 F.3d 78, 85 (3rd Cir. 2000). In order to qualify as *per se* disabled at the third step of the analysis, a claimant must show that his or her impairment (or combination of impairments) either "matches" a Listing or is "equivalent" to a Listing. *Sullivan v. Zebley*, 493 U.S. 521, 530-531, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). An impairment "matches" a Listed Impairment only if it satisfies *all* of the specified medical criteria contained within the applicable Listing. *Id.* at 530. An impairment is "equivalent" to a Listed Impairment only where it is supported by medical findings equal in severity to *all* of the criteria applicable to the most similar Listing. *Id.* at 531. The burden is on the claimant to present evidence in support of his or her allegation of *per se* disability. *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3rd Cir. 1992).

In this regard, the ALJ made the following findings:

> After careful consideration of all the evidence, the undersigned finds that the claimant is credible concerning the following symptoms and limitations, but only when the effects of active drug addiction are considered. She has a long history of addiction to the drugs listed above and to heroin, and has used such drugs orally, intravenously, and via inhalation (Exhibits 1F, 4F). During periods of drug intoxication she was subject to hallucinations, and as a result she received the diagnosis of substance-induced psychosis (Exhibits 4F, 6F, 7F). It is clear from recent records that treatment with anti-psychotic medication completely controls symptoms of psychosis (Exhibit 8F). The Administrative Law Judge finds that when the claimant takes medication as prescribed and abstains from drug and alcohol use she is free of psychotic symptoms, but that when she is noncompliant and uses drugs, she tends to experience psychotic manifestations including command hallucinations with a self-destructive quality (Exhibit 8F).
>
> The record shows that when the claimant is actively abusing substances and experiences the aforementioned psychotic disturbance, she is markedly limited in her abilities to interact appropriately with others or to sustain concentration. She has, in fact, experienced hallucinations commanding her to assault others and she has been jailed in the past for assault and resisting arrest (Exhibit 1F). She also, while active in her addiction, has experienced manic symptoms that would not permit her to sustain a routine, even in simple low-stress work (Exhibits 1F, 4F).
>
> Based on the foregoing, it is clear to the Administrative Law Judge that when the claimant is actively abusing drugs her mental impairment is so severe that it meets the diagnostic "A" criteria of

---

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.09.

14

> Listing 12.04 (psychomotor agitation; difficulty concentrating or thinking; suicidal ideation; and hallucinations). As a result, she experiences marked limitation in two of the broad functional areas covered under the severity-measuring "B" criteria of the same Listing. This means that when she uses drugs she satisfies Listing 12.09 for substance addiction disorder, via the cross-reference Listing 12.04.

(AR 16). Thus, the ALJ's finding of *per se* disability was based on a belief that Nomes had "marked" limitations during her periods of "drug intoxication" (AR 16).

The ALJ further found however, that if Nomes stopped her substance use, she would not meet a Listing:

> As noted above the claimant's psychotic symptoms are entirely controllable on medication with no residual symptoms - in fact, when she voluntarily took herself off the new medication Invega in August 2007 following a brief psychotic spell she did not experience recurrent hallucinations (Exhibit 7F). She is able to maintain a relatively normal mood, is not unduly anxious, and does not demonstrate psychomotor agitation or retardation. She is not suicidal or homicidal, and she has good insight into her condition and the role her past drug abuse has played in it. She is able to maintain excellent grooming and hygiene. She has no pressure of speech. She relates appropriately to medical staff and is able to interact with peers (Exhibit 4F). She is able to contract for her own safety (Exhibit 8F). She has no apparent loss of ability to maintain ordinary activities of daily living other than restrictions placed as a result of past legal entanglements and a need for protective housing due to abuse from a former spouse or paramour (Exhibit 7F). She spoke in a clear and coherent manner at the hearing and appeared to understand both the nature of the proceeding and the content of the questions being asked.

(AR 17).

A close review of the evidentiary record in this case reveals that the ALJ's materiality finding is not supported by substantial evidence. The record fails to reveal any meaningful difference in Nomes' functional limitations while abstinent and during periods of drug usage. On May 9, 2006, Dr. Bailey noted that Nomes had "a history of aggression while under the influence of substances" (AR 85). In that same examination report, however, Dr. Bailey also observed that Nomes had experienced "mood swings," "full-blown manias" and "depression" during periods of abstinence (AR 83). Dr. Bailey was left with the impression that Nomes had a bipolar disorder, given "her history of *marked* manic symptoms in the *absence* of substances"[9] (AR 86) (emphasis

---

[9] Dr. Bailey's examination report is "Exhibit 1," as cited in the ALJ's opinion (AR 2; 16; 83-87).

added). The documentary record indicates that Nomes' substance addiction was in "early remission" in August 2006, when she was hospitalized at St. Vincent[10] (AR 120). Moreover, according to the documentary record, Nomes told Dr. Su that she had not consumed illegal drugs or alcohol during the eight months immediately preceding her August 2007 hospitalization at Millcreek and had been taking her medications at the time of her admission (AR 172; 175). At the hearing, Nomes testified that she had experienced "relapses" of her drug addiction in January 2006 and December 2006, but that she had not abused drugs or alcohol during the intervening and subsequent periods of time (AR 204-205). According to the medical records, however, these "relapses" did not coincide with Nomes' hospitalizations in August 2006 and August 2007.

In light of the foregoing analysis, the ALJ's materiality determination cannot be affirmed. The only remaining question is whether a judicially-ordered award of benefits is proper, or whether the case should be remanded to the Commissioner for further administrative proceedings. An immediate award of benefits is called for only where the evidentiary record has been fully developed, and where the evidence as a whole clearly points in favor of a finding that the claimant is statutorily disabled. *Morales v. Apfel*, 225 F.3d 310, 320 (3rd Cir. 2000). That standard is not met here. The record does not contain a residual functional capacity assessment from a treating or examining physician. The only opinion evidence concerning Nomes' ability to engage in work-related activities is Dr. Glover's consultative report, which predated Nomes' hospitalizations at St. Vincent and Millcreek (AR 102-117). Furthermore, even if the record had conclusively established that Nomes' substance abuse was not material to her "disability" during the entire period of time between her alleged onset date and the date of the ALJ's decision, a question would remain as to whether a finding of materiality would be warranted with respect to a subset of that time period. Although Nomes' alleged onset date was November 5, 2005, her counsel conceded at the hearing that Nomes' substance abuse may have been "material" to her disability prior to January 2006 (AR 226-227). The documentary record contains no evidence predating February 16, 2006 (AR 2; 90-92). For these reasons, further development of the record is needed.

---

[10] The record of Nomes' psychiatric hospitalization at St. Vincent is "Exhibit 4F," which is cited in the ALJ's opinion (AR 2; 16; 118-121).

## V. Conclusion

The Court expresses no opinion as to whether Nomes is entitled to DIB and SSI benefits under the Act. It suffices to say that the Commissioner's decision is not "supported by substantial evidence" within the meaning of § 405(g), and that further administrative proceedings are required. Accordingly, the motion for summary judgment filed by the Commissioner will be denied, and the motion for summary judgment filed by Nomes will be granted only to the extent she seeks a remand for further consideration. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| KRISTA L. NOMES, | ) | |
| --- | --- | --- |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 09-112 Erie |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## ORDER

AND NOW, this 3rd day of August, 2010, and for the reasons set forth in the accompanying Memorandum Opinion, IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 7] is GRANTED only to the extent she seeks a remand for further consideration by the Commissioner. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

IT IS FURTHER ORDERED that the Defendant's Motion for Summary Judgment [Doc. No. 9] is DENIED.

The clerk is directed to mark the case closed.

s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record.